The Ordinary.
I have no difficulty in deciding this case at once ; but as the parties may be saved future expense by a decision of the several points which have been raised before me on the argument, I will take them up in order.
Nothing is more embarrassing in our whole municipal system than this subject of the powers of the ordinary, the surrogates, and the orphans’ court. The course and practice of ecclesiastical courts in general, are so little familiar to our bar, and our statute laws are often so vague and uncertain, that the whole subject presents a wilderness of perplexity to the practitioner. A reference to the history of the courts exercising ecclesiastical jurisdiction in fil ew-Jersey, may serve to throw some light m this subject.
After the surrender of the powers of government by the proprietors of the province to queen Anne, in seventeen hundred and two, the specific form of its constitution depended, until the adoption of our present constitution in seventeen hundred and seventy-six, upon the commissions and instructions given to the several governors who were appointed by the crown. These instructions were little varied during the whole period. In reference to the constitution of the office and duties of the ordinary, they were never varied at all.
By the commission and explanatory instructions given to *413 lord Cornbury, the first royal governor, all the ecclesiastical jurisdiction of the province relating toi£ the collating to benefices, granting licenses for marriages and probate of wills,” was reserved to the governor: Leaming and Spicer, 639. He was not only ordinary, but metropolitan of the province. He had no superior but the queen in council. His court was called the ££ prerogative court,” an appellation applied in England to the archbishop’s court. Nor had he any subordinates ; his jurisdiction over these subjects was sole and exclusive. This constitution of the court continued till the revolution, and was adopted by the convention which framed the present constitution of the state in seventeen hundred and seventy-six. Eor one hundred and forty years the governor or ordinary has been the only judge of probate known to the constitution of New-Jersey.
But at an early day the provincial governors, for their own and the people’s convenience, appointed deputies, with the name of surrogates, residing in different parts of the province, to act in their stead, upon such cases as the people chose to submit to them. Sometimes there were more of these deputies, sometimes less; sometimes more than one in a county, sometimes only one for two or three counties. They were mere deputies, subject to the control and supervision of the ordinary, and to be removed at his pleasure. By appointing them the ordinary did not in the least curtail his own jurisdiction. Whilst he held appellate jurisdiction of their acts, his own original jurisdiction remained entire.
These surrogates did not hold to the ordinary the relation which the English ordinaries hold to their metropolitan. The English ordinary has exclusive jurisdiction where the goods of the deceased are all situated in his diocese; and the metropolitan has exclusive jurisdiction where notable goods are situated in two or more dioceses. No relation of this kind subsisted between the ordinary and surrogates of New-Jersey. The ordinary retained jurisdiction of all cases. The surrogate, acting as his deputy, had also jurisdiction of all cases submitted to *414 liim, unless- some special restriction were inserted in his com . mission. New-Jersey was never subdivided into dioceses. The ‘doctrine of bona notabilia had never any place here.
The power of the ordinary to appoint these officers, seems never to have been questioned. Their acts were recognized as valid by the courts, and they came to be considered as lawful ■and competent judges of the matters submitted to their cognisance. And although they are unknown to the eonstitution, they have been frequently recognized by acts of the legislature. But no legislature has ever attempted materially to alter the relation between the ordinary and his surrogates.
The first act which appears on our statute book, in relation to the courts of probate, is that of December, seventeen hundred and eighty-four, by which it was directed, “ that the ordinary should thereafter appoint but one deputy or surrogate in each county, and that the power and authority of the surrogate should be limited to the county for which he should be appointed.” This act also established a new county court, called the orphans’ court, composed of at least three judges of the common pleas, which, besides considerable equitable jurisdiction, was invested with certain of the powers previously exercised by the surrogate, such as hearing and deciding disputes about the validity of wills and rights of administration: which when they arose before the surrogate, he was directed to hand over to that court. Thus the orphans’ court shared a portion of the surrogate’s previous jurisdiction, and so far stood in his shoes, an appeal lying to the ordinary from its decisions in the same manner as from those of the surrogate’s. Both the surrogate and the orphans’ court, in matters of probate and administration, were left to occupy the same relation to the ordinary, which, previous to the statute, the surrogate alone had occupied. The present law, which was passed in eighteen hundred and twenty, is similar in this respect to that of seventeen hundred and eighty-four.
The fact, that in eighteen hundred and twenty-two, the appointment of his surrogates was taken from the ordinary and *415 conferred upon tbe joint meeting, (Harr. Com. 32,) does not, in the least, alter their relative jurisdictions or powers. The surrogates are still, in the language of tbe act of eighteen hundred and twenty, the ordinary’s surrogates, and, in effect, his “deputies.”
From this short sketch of the history of these jurisdictions, it sufficiently appears that the ordinary has the same original and appellate powers, now, that he ever bad. He has never been deprived of these powers by any act of the legislature, in tact; leaving out of view the question whether an act oí that kind would be constitutional if passed at all. The acts of seventeen hundred and eighty-four and eighteen hundred and twenty are merely declaratory, so far as they attempt to specify the subjects of the ordinary’s jurisdiction, or that of his surrogates. I have, therefore, no doubt at all that the ordinary’s original jurisdiction over the probate of walls, and the granting of letters of administration, is general and full, and not limited and special.
Neither have I the least doubt as to the ordinary’s jurisdiction over a case like the present, where the testator resided, at the time of his death, in a foreign state, and where the will has already been proved there. The ordinary has cognizance of this class of cases, by virtue of his general powers. It is a power which is frequently exercised by the ecclesiastical courts of England: 1 Williams’s Exec. 172, 204; 1 Hagg. Rep. 625. And the jurisdiction of the ordinary is complete without the aid of statute on the subject — at least where the original will is produced. Whether he may grant letters testamentary upon an exemplified copy, is, perhaps, doubtful. It is the opinion of intelligent counsel that under the act of seventeen hundred and thirteen and fourteen, he may. Elm. Dig. 595, pl. 3; 4 Griffith, L. R. 1241, n.
Whether, since the acts of seventeen hundred and eighty-four and eighteen hundred and twenty have limited the surrogate’s jurisdiction to his own county,he may grant probate of a foreign will without recourse to the statutes, has been questioned by *416 some. The precise meaning of that limitation has not been defined. But I believe it is generally conceded by the bar that the surrogate’s jurisdiction does extend to such a case. I have known instances of its being exercised under the advice of careful and eminent counsel. The limitation of the surrogate’s power by county lines may have relation simply to the territory within which he may perform any act as surrogate. The surrogate of Morris or Cape May, for example, may not go into the county of Middlesex and transact the local business of that county, which would naturally come before the surrogate oí Middlesex. Or it may go further, and debar the surrogate oí one county cognizance of probate or administration where the deceased resided, at the time of his death, in another county, the surrogate of which may be deemed to have a preferable right to take jurisdiction of the case. This is the construction given by Mr. Griffith, 4 Law Reg. 1238, n. But neither oí these constructions of the limitation created by the statute would prevent any surrogate from proving the will of a non-resident of the state, where one surrogate cannot set up any better claim to cognizance of the case than another: 4 Griffith's L. Reg. 1241, n. But however this may be, there is no question but that the ordinary has complete jurisdiction.
This jurisdiction of the ordinary is not taken away or impaired by the act of eighteen hundred and twenty-eight, which authorizes any surrogate to grant letters testamentary upon an exemplified copy of a foreign will proved in another state. That act is merely affirmative. It does not, in the least, interfere-with the general ex officio powers of the ordinary, or the manner of exercising them. At all events, where the original will is produced and proved before him,he needs recourse to no statutory authority to proceed; no statute has restrained his general authority. Nor is he bound by the terms or the equity of that statute to exact security of foreign executors. Since the passage of the law of eighteen hundred and twenty-eight, I have known-repeated cases, conducted under the advice of astute counsel where original foreign wills have been proved in the usual man *417 ner, both before the ordinary and surrogate, without reference to the statute : and no security has ever, to my knowledge, in any such case, been exacted of foreign executors. Where, however, it is necessary,or the executors choose to proceed under the statute, of course they are bound by its terms, and must give bond as is thereby required.
But suppose, in the ease of a foreign will, proved in another state, one executor has applied under the statute, may not another executor produce and prove the original will, irrespective of the statute ? I have no doubt he may. The statute is not compulsory where the original will can be produced. There is no reason why a foreign executor, for example, should be compelled to proceed under the statute, because his co-executor may have done so, and thus be bound to give security contrary to the general policy of the law. He is invested by his testator with a personal trust and confidence. He accepted a burden at the hands of his deceased friend ; and it is against all sound reason that he should be fettered and bound by restrictions which that friend never intended to impose; or that the latter should be deprived, by an arbitrary rule of law, of the services of one to whom he wished to commit the care of his estate after his death.
Nor is it necessary that the executor who produces the original will, should prove it before the same surrogate who has already granted letters testamentary to his co-executor. He may, without doubt, prove it before the ordinary, or perhaps before another surrogate. The applications are distinct and independent. When, however, the executors have all taken out letters, they are co-executors of the will, and must sue and be sued jointly, in the same manner as if they had all proved the will at the same time, and before the same oflicer.
With reference, therefore, to those points of objection made to this application, which I have thus far considered, I should have no hesitation in allowing probate of this will and codicil by the applicant.
But there is one difficulty in this case, which cannot be sur *418 mounted. Notwithstanding the complete original jurisdiction which the ordinary has in all cases of probate and administra tion, his jurisdiction is concurrent with that of his surrogates. These officers have long been recognised by the laws, and although they at first derived their powers from the ordinary, as his deputies, those powers have been confirmed to them by long usage and successive declaratory acts of the legislature; and the ordinary cannot now resume them at will, nor supersede their proceedings under and by virtue of those powers. And it follows as a necessary consequence, that whenever a surrogate has obtained cognizance of a particular case, the ordinary cannot interfere pendente lite. He may review the surrogate’s proceedings by appeal, but in no other way. The concurrent jurisdiction of the surrogates is extended by the act of eighteen hundred and twenty-eight, to cases of the kind now under consideration, even if they did not have it before.
The question then arises, had the surrogate of Morris taken cognizance of this case when application was made to the ordinary % Most assuredly he had. If Marsh had alone applied to the surrogate of Morris for letters testamentary under the statute, the ordinary could still have taken cognizance of Coursen’s application. But it appears by the certified copy of the surrogate’s proceedings, that both these executors applied to him; and' until that application, and the cognizance of the surrogate ai’ising thex’eupon, were exhausted, I could not interfex-e. And it appears that Coursen’s application to this court was made pending the proceedings in Morris. I cannot, therefore, take cogixizance of the case. It would be a pernicious example to be set by the ox’dinary. I must refuse the probate of this will and codicil on the application now before me. If a subsequent application should be made, free from this objection, after the Bxxrrogate’s cognizance is spent, I shall have no hesitation in granting it.
In making this decision, of coux’se, I x-eceive the certified ;opy of the suiTOgate’s proceedings as a vexúty. I axxi bound to respect his attestation xxnder Ixxs official seal. In this court it *419 has the effect of a record, against which I cannot admit counter averments. The proof which has been offered to impeach it, I cannot receive. Any error or irregularly in the proceedings of the surrogate, can come before me only by appeal.
The decision of this case cannot, in the least, be affected by any aspect of the contest between these executors, on which it is not proper for me now to remark; nor is it affected by the fact that Marsh cannot take out letters in New York without giving security. I am to decide by the law of New Jersey, without reference to the laws of New York. The latter might have to be consulted in determining the validity of the will, but not in determining the mode of granting probate. Nor is the question affected by the amount, the situation, or the nature of the estate. Be it iarge or small, real or personal, in New York or in New Jersey, the law regulating the manner of probate here, must be the same.
As to the question whether Marsh might put in a ca/oeat before me, against proving the codicil, I am inclined to think he might. A caveat is incident to all ecclesiastical courts, and prevents the case from being proceeded in without the cmeator being heard. It is a general rule that all persons who might be injured by admitting a will or codicil to probate, may ca/oeat against it. In this case, Marsh was appointed an executor by the original will; the codicil substitutes a new co-executor to act with him. There may be strong reasons why this substitue tion should operate injuriously to him. But as it is not necessary to decide this point, I shall express no positive opinion upon it.
The application is refused.
Cited in Graham v. Houghtalin. 1 Vr. 569.